1
2
3
4              UNITED STATES DISTRICT COURT
5            NORTHERN DISTRICT OF CALIFORNIA
6

<table>
<tr><td>

7  GOLDEN GATE WAY, LLC,

8             Plaintiff,

9       v.

10  ENERCON SERVICES, INC., et al.,

11            Defendants.

</td><td>

Case No.  20-cv-03077-EMC

**ORDER GRANTING DEFENDANT'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

Docket No. 78

</td></tr>
</table>

12
13
14              I.      **INTRODUCTION**

Plaintiff and Counter-Defendant Golden Gate Way, LLC ("GGW") has brought this action against Defendant and Counter-Claimant Enercon Services, Inc. ("Enercon") based on Enercon's alleged contamination of GGW's property while conducting environmental consulting work in 2008.  *See* Docket No. 59 ("FAC").  GGW asserts claims under CERCLA, 42 U.S.C. § 9601 *et seq.*, and California's Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code § 25300 *et seq.*, as well as for various common-law torts.  *See* FAC.  Pending before the Court is Enercon's motion for partial summary judgment based on a limitation of liability provision in the parties' contract for the consulting work.  *See* Docket No. 78 ("Mot.").  Enercon argues that the provision "applies to the claims asserted by GGW against Enercon," that it is enforceable, and that it limits GGW's total recovery in this matter to $14,939.80.  *Id.* at 4.  GGW opposes the motion, arguing that that the provision is unenforceable because, during contractual negotiations, Enercon failed to disclose to GGW (1) the environmental risks involved in Enercon's consulting work and (2) the scope of Enercon's insurance coverage for the project.  *See* Docket No. 84 ("Opp'n") at 1.

For the following reasons, the Court **GRANTS** Enercon's motion for summary judgment

United States District Court
Northern District of California

United States District Court
Northern District of California

1 on the five related issues that it raises and holds that GGW's potential recovery in this case is

2 limited to $14,939.80.

3                          II.        **BACKGROUND**

4 A.        Factual Background

5          "This case arises out of the environmental contamination at and around [certain] real

6 property" in Lafayette, California, which GGW has owned since 1987.  Docket No. 77

7 ("Stipulated Facts") ¶ 5.  From approximately 1956 until 1999, a dry-cleaning business operated at

8 the property and used the chemical agent perchloroethylene ("PCE").  *See id.*

9          In 2008, GGW attempted to refinance its loan on the property with Union Bank.[1]  *See* Mot.

10 at 5, Opp'n at 2.  As part of the loan-refinancing process, Union Bank required GGW to conduct a

11 Phase I environmental investigation on the property, which was completed in August 2008.

12 Opp'n at 2.  Union Bank then further "required GGW to retain a bank-approved consultant to

13 perform a Limited Phase II subsurface investigation," *id.*, "to determine whether dry cleaning

14 contamination was present" at the property, Mot. at 6.  Per its policy, the bank solicited bids for

15 the Phase II investigation and presented GGW with two proposals, one from Enercon (dated

16 September 4, 2008) and another from a firm called Geologica.  *See* Opp'n at 2-3, Mot. at 6.  The

17 proposals were received by William Peacock, GGW's "managing partner" and "sole decision

18 maker," on September 9, 2008.  *See* Opp'n at 3, Mot. at 5-6.  Mr. Peacock informed Union Bank

19 "that he was going to call both consultants with questions and then make a decision" about which

20 to hire by September 12, 2008.  Mot. at 6.

21          In addition to running GGW, Mr. Peacock was the president of Peacock Construction Inc.,

22 a company that he founded in 1982 and had grown into a successful business by the time he

23 retired in 2013.  *See id.* at 5, Opp'n at 10.  "Mr. Peacock graduated from San Diego State

24 University with a degree in business administration in 1969," and later worked as a real estate

25 broker and property manager at multiple large companies before starting his own business.  *See*

26 Mot. at 5.  At each of his jobs, Mr. Peacock was responsible for contracting with other parties; he

27

28 [1] For ease of reference the Court generally refers to the parties' briefs, which contain citations to
the relevant record evidence.  The Court cites directly to the record where necessary.

estimates that "he signed over a thousand contracts while President of Peacock Construction." *See id.* Prior to his agreement with Enercon in 2008, however, "Mr. Peacock had never been part of any type of environmental matter or contract" and was used to the purported custom in the construction industry of each (insured) party bearing financial responsibility for any risks that it created. *See* Opp'n at 10. Enercon, meanwhile, is a nationwide firm that performs "site assessment work," "environmental investigation[s]," and "remediation services," and has extensive "experience relating to environmental matters and contracts." *See id.* at 2.

Shortly after receiving and reviewing Enercon's proposal for the Phase II investigation, Mr. Peacock spoke with John Wharff, a Senior Project Manager at Enercon, via phone. *See* Mot. at 6, Opp'n at 4. The proposal was a three-page, typed document that included the scope of services for the investigation, a site safety plan, a disclaimer of consequential damages, and a suggested schedule. Docket No. 78-1 ("Zagon Decl."), Ex. C at MUB000004-MUB000006. The proposal also contained, on its second page, a section entitled "Limitations." *Id.* at MUB000005. It stated, in full:

> Golden Gate Associates, LLC, herein referred to as the client; and ENERCON, herein referred to as the consultant, *have discussed the risks and rewards associated with this project*, as well as consultant's fee for services. *Client and consultant agree to allocate certain of the risks so that*, to the fullest extent permitted by law, *consultants [sic] total aggregate liability to the client* and all contractors and subcontractors *is limited to our fee for any and all injuries, damages, claims, losses, expenses or claim expenses (including attorney's fees) arising out of this agreement from any cause or causes*, [sic] such causes include, but are not limited to, consultant's negligence, errors, omissions, strict liability, or breach of warranty. Client further agrees to notify all contractors and subcontractors of this limitation of consultant's liability to them and require them to abide by this limitation of damages suffered by any contractor or subcontractor arising from consultant's actions or inactions. Neither the contractor nor any subcontractor assumes any liability for damages to others which may arise on account of consultant's actions or inactions. As used in this paragraph, "consultant" includes consultant, consultant's sub-consultants and contractors, and their respective partners, officers, directors, shareholders, and employees.

*Id.* (emphasis added). The "Limitations Provision" thus specifies that Enercon's "total aggregate liability" to Golden Gate Way "for any and all injuries, damages, claims, losses, expenses or claim expenses . . . arising out of this agreement" would be "limited to [Enercon's] fee" for the Phase II

investigation, which GGW does not dispute ultimately amounted to $14,939.80.  *See id.*, Opp'n,

Mot. at 10.

In his conversation with Mr. Wharff, Mr. Peacock focused on Enercon's experience and its

availability to begin the investigation quickly.  *See* Mot. at 6, Opp'n at 4.  Mr. Peacock also asked

whether he could add a new term to the proposal, which would require Enercon to name GGW as

an additional insured on its commercial general liability ("CGL") insurance policy.  *See* Mot. at 6,

Opp'n at 4.  Mr. Wharff answered in the affirmative.  Mot. at 6.  At his deposition, Mr. Peacock

averred that the only aspect of Enercon's proposal that he addressed during their conversation was

the additional insured term:

> Q.  Okay.  Did you ask Mr. Wharf [*sic*] about any of [the] provisions
> in the proposal which you had read?
> A.  Yes.
> Q.  On your phone call?
> A.  Yes.
> Q.  What did you ask him?
> A.  Told him if we decided to go ahead, that I wanted to add the
> additional insurer term that I wrote in there to the—to the proposal.
> . . .
> Q.  Okay.  What else did you tell Mr. Wharf [*sic*], if anything, about
> the terms in the contract?
> A.  I didn't tell him anything.
> Q.  Okay.  What was Mr. Wharf's [*sic*] response to you telling him
> you wanted to write in some insurance requirements?
> A.  No problem, go ahead and do it.
> Q.  So Mr. Wharf [*sic*] didn't tell you this was a take it or leave it
> contract . . . and we don't take changes from customers?
> A.  No, I never heard that.

Zagon Decl., Ex. A at 104:12-105:10.  Mr. Peacock further clarified that he did not discuss the

Limitations Provision with Mr. Wharff:

> Q.  Now, unlike the insurance provision you wrote into the contract,
> Mr. Peacock, you made no changes to the limitation section in [the
> proposal], correct?
> A.  That is correct.
> Q.  Other than asking to add[,] if you could have the insurance
> provision, to which Mr. Wharf [*sic*] said yes, did you ask Mr. Wharf
> [*sic*] any questions about the contract or the proposal?
> A.  No.

*Id.* at 117:16-24.  Elsewhere in his deposition, "Mr. Peacock confirmed that he had the opportunity

to read the proposal in detail and that Mr. Wharff did not say anything to dissuade him from doing

so."  Mot. at 8 (referring to Zagon Decl., Ex. A at 104:12-105:19, 106:23-25).

According to GGW, Mr. Wharff did not address any risks associated with the Phase II investigation, such as the possibility that Enercon's work could result in contamination at GGW's property and create "substantial remediation cost[s]," during his conversation with Mr. Peacock. Opp'n at 4.  This was in spite of the fact that the Limitations Provision in Enercon's proposal states that the parties "discussed the risks and rewards associated with th[e] project."  *See id.*, Zagon Decl. at MUB000005.  In his deposition, Steven Walker, Enercon's designated deponent in this matter, *see* Fed. R. Civ. P. 30(b)(6), acknowledged that he did not have any records or other information "show[ing] specifically that a discussion of risks and rewards occurred" between Enercon and Golden Gate Way "except as laid forth in the [L]imitation section."[2]  *See* Docket No. 84-1 ("Greben Decl."), Ex. 5 at 74:19-77:12, 79:14-20.  Mr. Peacock asserts that, because Enercon never described "the risks associated with the project" to him or anyone else at GGW, he was "not aware that Enercon could cause the spread of contamination as a result of performing its work on the property" and that he "would not have agreed to the limitation of liability [provision] had [he] been aware of such potential calamity."  Docket No. 84-2 ("Peacock Decl.") ¶¶ 18-19.

Following their phone call and per his oral agreement with Mr. Wharff, "Mr. Peacock wrote into the Proposal [the] insurance term he wanted based on language he used at Peacock Construction and his past contracting experience."[3]  Mot. at 8.  Mr. Peacock's handwritten provision states: "Prior to commencement of field work Enercon will provide Golden Gate Associates a Certificate of Insurance for General Liability & Workers Compensation naming them as an Additional Insured."  Zagon Decl., Ex. D.  Mr. Peacock also made a number of smaller changes to the proposal, crossing out "LLC" where the term appeared after "Golden Gate Associates" on pages 1 and 3 and initialing those corrections and each page of the proposal in its

---

[2] Mr. Walker also observed that he did not "specifically know that there were no communications" about risks and rewards "after Mr. Peacock received the contract" proposal.  *See* Opp'n at 5.

[3] In his deposition, Mr. Peacock estimated that he "had handwritten terms into a contract at least 30 times and 'probably' more than 100 times."  Mot. at 8 (citing Zagon Decl., Ex. A at 67:20-20). He also admittedly knew, based on his experience in the construction industry, "that insurance requirements for specific types of coverage were often included in contracts."  *Id.* (citing Zagon Decl., Ex. A at 32:21-35:20).

United States District Court
Northern District of California

bottom righthand corner.  *Id.*  "On September 12, 2008, GGW returned the contract" to Enercon with the foregoing alterations, including Mr. Peacock's handwritten "Insurance Provision."  Opp'n at 7.  This document is the parties' operative contract in this matter.

Pursuant to the Insurance Provision, Enercon later sent GGW a Certificate of Insurance, dated October 7, 2008, naming GGW as an additional insured on Enercon's CGL, Workers Compensation and Employers' Liability, and Professional Liability policies.  *See* Docket No. 78-2 ("Wheeler Decl."), Ex. A.  GGW's coverage period under the CGL and Workers Compensation policies ran from July 1, 2008, through July 1, 2009, and the policies had per-occurrence and aggregate limits of $1 million and $2 million, respectively.  *Id.*  The Certificate also stated that "the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies."  *Id.* (capitalization omitted).  The Certificate was comprised of just two pages, with the second page containing three paragraphs of additional instructions and a disclaimer.  *Id.*

Unbeknownst to Mr. Peacock and GGW, Enercon's insurance policies "included a pollution exclusion, meaning that [they did] not cover losses in connection with the potential spread of contaminants" at Enercon's job sites.  Opp'n 8, Peacock Decl. ¶ 23.  GGW first learned of the "Pollution Exclusion" when Enercon's insurer sent counsel for GGW a letter in January 2021 denying GGW coverage in this matter on the ground of the exclusion.[4]  *See* Docket No. 84-3 at 6.  Mr. Peacock asserts that had he been informed of (1) the environmental harms potentially resulting from the Phase II investigation and (2) the fact that Enercon's insurance policies would not necessarily cover GGW (as an additional insured) for such risks, he "would not have agreed to

---

[4] In the letter, Enercon's insurer also initially denied coverage to GGW because it concluded that GGW was not "an additional insured under the Enercon policy."  Docket No. 84-3 at 6.  The insurer stated that its denial was based on the fact that "[t]he only additional insured language in the proposal is handwritten with no validation of when this was added to the proposal."  *Id.*  In May 2021, the insurer reversed its decision as to GGW's additional-insured status but maintained that coverage was still precluded on the basis of the Pollution Exclusion.  *Id.* at 9.  As GGW therefore concludes, Enercon's insurance policy "would have covered" the relevant "type of damage to GGW's property but for the" Pollution Exclusion.  Opp'n at 8.  The letter denying coverage from the insurance to GGW stated: "Please note the Federal policy contains the Pollution exclusion which would apply to preclude coverage for this loss."  Westbrook Dec., Ex. 1.  However, Enercon may be covered by a different insurance policy obtained later in time.  Opp'n at 9; Greben Dec., Ex. 7.

1   insurance that contained a pollution exclusion." *See* Peacock Decl. ¶ 24.

2        Over the course of fall 2008, Enercon completed the Phase II investigation, which revealed

3   "the presence of PCE and related contamination in the subsurface soils, soil-gas[,] and

4   groundwater" at GGW's property. Mot. at 10. GGW paid Enercon a total of $14,939.80 for the

5   investigation. *Id.* In November 2008, "Enercon performed some additional work" for GGW,

6   based on the same contract terms that the parties had previously agreed to for the Phase II

7   investigation, including the Limitation and Insurance Provisions. *See id.*, Opp'n at 10. Enercon

8   was paid $4,610.09 for this second project, bringing its total for all GGW-related work to

9   $19,549.89. *See* Mot. at 10, 4. "Enercon has not performed work for GGW since 2008." *Id.*

10  B.   Procedural Background

11       GGW filed its original complaint in this case in May 2020.[5] *See* Docket No. 1. It asserted

12  multiple claims under federal and state law, including CERCLA and the HSAA, against Enercon

13  and ERM-West, Inc., another environmental consulting firm. *See id.* GGW filed a First Amended

14  Complaint ("FAC") in December 2020, a few months after the Court denied GGW's motion to

15  strike allegations in Enercon's Answer and Counterclaims relating to the Liability Provision. *See*

16  FAC, Docket No. 42 at 2-6. Enercon filed its Answer and Counterclaims to the FAC in January

17  2021. *See* Docket No. 63. In April 2021, GGW and ERM-West settled their claims against one

18  another, and ERM-West was dismissed from the case. *See* Docket Nos. 73 and 82.

19       Enercon filed the instant motion for partial summary judgment in May 2021. *See* Mot.

20  The company requests summary judgment on its Twelfth Affirmative Defense in its amended

21  Answer and Counterclaims, *see* Docket No. 63 ¶ 135, specifically with respect to whether:

22       •   "The limitation of liability provision . . . applies to the claims
23           asserted by GGW against Enercon in this case";

24       •   "The limitation of liability provision . . . is enforceable as a
         matter of law";

25  _____

26  [5] In 2009, "GGW filed a federal action in the Northern District of California entitled *Golden Gate Way, LLC v. Stewart*" against the previous owners of the Lafayette property and the operators of

27  the dry-cleaning business. Docket No. 74 at 2, Mot. at 3. This "case was later dismissed and refiled in 2016" in state court. Docket No. 74-2. In 2019, "GGW filed another action" in state

28  court involving the same parties. *Id.*, Mot. at 3. The two state-court cases were consolidated and later settled. Docket No. 74 at 2, Mot. at 3.

United States District Court
Northern District of California

- "GGW's affirmative defenses asserted to establish [that] the limitation of liability provision is unenforceable cannot be established as a matter of law"; and

- "GGW's total [potential] recovery against Enercon is limited to $14,939.80, which is the amount paid to Enercon by GGW for the Limited Phase II site investigation work, or[,] at most, the total amount of $19,549.89 paid by GGW to Enercon for all work."

Mot. at 4.

GGW opposed the motion in June 2021, *see* Opp'n, and Enercon replied shortly thereafter, *see* Docket No. 85 ("Reply").  The Court held a hearing on the motion on July 23, 2021.[6]  *See* Docket No. 108.

### III.  LEGAL STANDARD

A.  Summary Judgment

Federal Rule of Civil Procedure 56 provides that a court shall grant summary judgment, in whole or in part, to a moving party "if the movant shows," based on record materials such as the pleadings, depositions, answers to interrogatories, and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the non-moving party and all justifiable inferences are to be drawn in the

---

[6] In its opposition, GGW makes much of the fact that Enercon's insurer reversed its decision as to GGW's additional-insured status just three days after Enercon filed the instant motion, suggesting that the timing of the insurer's decision raises questions "about the insurer's contact with Enercon during this timeframe, which is of concern based on the insurer's separate duty to GGW, as well as the potential that Enercon is perpetrating [a] fraud."  *See* Opp'n at 8; Docket No. 84-3 at 6, 9.  The parties ultimately filed short supplemental briefs relating to these questions.  *See* Docket Nos. 102 and 104.  As Enercon states, however, it is presently "undisputed that GGW is an additional insured on [Enercon's] general liability policy" and GGW has not provided any factual basis for inferring that Enercon "has manipulated evidence or deceived GGW" regarding the additional-insured issue.  *See* Docket No. 104 at 1.  The Court therefore considers the issue moot and declines to further address it here.

United States District Court
Northern District of California

1   non-movant's favor.  *See id.* at 255.

2   "The moving party initially bears the burden of proving the absence of a genuine issue of

3   material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

4   *Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  "Where the non-moving party bears the burden of

5   proof at trial, the moving party need only prove that there is an absence of evidence to support the

6   non-moving party's case."  *Id.* (citing *Celotex*, 477 U.S. at 325).  "Where the moving party meets

7   that burden, the burden then shifts to the non-moving party to designate specific facts

8   demonstrating the existence of genuine issues for trial."  *Id.* (citing *Celotex*, 477 U.S. at 324).

9   "This burden is not a light one," as "the non-moving party must do more than show there is some

10  'metaphysical doubt' as to the material facts at issue."  *Id.* (quoting *Matsushita Elec. Indus. Co.,*

11  *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

12  B.   Contract Interpretation

13        As the California Supreme Court has stated,

14            The fundamental rules of contract interpretation are based on the
              premise that the interpretation of a contract must give effect to the
15            mutual intention of the parties. . . . Such intent is to be inferred, if
              possible, solely from the written provisions of the contract.  The
16            clear and explicit meaning of these provisions, interpreted in their
              ordinary and popular sense, unless used by the parties in a technical
17            sense or a special meaning is given to them by usage, controls
              judicial interpretation.  A [contractual] provision will be considered
18            ambiguous when it is capable of two or more constructions, both of
              which are reasonable.  But language in a contract must be
19            interpreted as a whole, and in the circumstances of the case, and
              cannot be found to be ambiguous in the abstract.  Courts will not
20            strain to create an ambiguity where none exists.

21  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 18-19 (1995) (internal quotations omitted); *see also*

22  Cal. Civ. Code §§ 1635-63 (codifying these interpretive principles).

23        To be sure, if a contract is found to be ambiguous, parol evidence may be considered.

24  Whether a written contract is ambiguous is a question of law.  *Airborne Freight Corp. v.*

25  *McPherson*, 427 F.2d 1283, 1285 (9th Cir. 1970).  An ambiguity arises when language is

26  reasonably susceptible to another meaning.  *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage &*

27  *Rigging Co.*, 69 Cal. 2d 33 (1968).

28        When deciding whether to admit parol evidence, a court may provisionally receive,

1   without actually admitting, all credible evidence concerning the parties' intentions to determine

2   whether the language is "reasonably susceptible" to the interpretation urged by a party.  *F.B.T.*

3   *Productions, LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010) (citing *Winet v. Price,* 4

4   Cal.App.4th 1159, 6 Cal.Rptr.2d 554, 557 (1992)).  Only if the court decides the language is

5   "reasonably susceptible" to the interpretation urged and an ambiguity is found, can extrinsic

6   evidence be admitted.  *Id.*  If the court finds that the contract is not reasonably susceptible and is

7   unambiguous as a matter of law, extrinsic evidence cannot be received.  *McPherson*, 427 F.2d at

8   1286.

9                              **IV.    DISCUSSION**

10          Enercon's motion for partial summary judgment argues that it has satisfied its burden

11   under Rule 56 because "there is no genuine dispute as to every essential element of its limitation

12   of liability defense," namely that the Limitation Provision (1) "applies to GGW's claims in this

13   case" and (2) is enforceable.  Reply at 1.  In Enercon's view, the unambiguous meaning of the

14   Liability Provision is that Enercon's potential liability for any claims or injuries to GGW arising

15   out of the Phase II investigation is limited to the amount that GGW paid Enercon to perform the

16   investigation, *i.e.*, $14,939.80.  *See id.*  Enercon also contends that "limitation of liability

17   provisions are legally enforceable" in general and in the circumstances of this case.  *Id.*

18          GGW does not seriously dispute Enercon's interpretation of the Liability Provision;

19   instead, it asserts several affirmative defenses based on the theory that Enercon misled GGW by

20   failing to disclose (1) the significant environmental risks of its work at GGW's Lafayette property

21   and (2) the existence of the Pollution Exclusion in its insurance policy, which deprived GGW, as

22   an additional insured under the policy, of coverage for such risks.  *See* Opp'n at 1.  GGW's

23   affirmative defenses to Enercon's limitation-of-liability defense include (1) a lack of meeting of

24   the minds; (2) unconscionability/against public policy; (3) mistake; (4) unclean hands; (5) waiver;

25   (6) estoppel; and (7) various species of fraud, such as fraud in the inducement, fraud in the factum,

26   constructive fraud/negligent misrepresentation, promissory fraud, and concealment.[7]  *See id.* at 14-

27   _____

28   [7] In GGW's Answer to Enercon's Counterclaims, the aforementioned affirmative are numbered
     14, 17, 20, 26, 27, 28, 29, 30, 31, 32, and 33, respectively.  *See* Docket No. 67.

United States District Court
Northern District of California

22.

The Court addresses these issues in turn.

A.      Liability Provision's Applicability

First, the Court finds that the Liability Provision is applicable to GGW's claims.  As Enercon argues, the terms of the provision are plain: GGW and Enercon "agree[d] to allocate certain of the risks" of the Phase II investigation so that Enercon's "total aggregate liability" to GGW would be "limited to [Enercon's] fee for any and all injuries, damages, claims, losses, expenses or claim expenses (including attorney's fees) arising out of [the parties'] agreement." Zagon Decl., Ex. C at MUB000005; Mot. at 12.  Further, "[i]t is undisputed that GGW's claims and alleged damages against Enercon arise out of the Agreement" and that GGW ultimately paid Enercon a fee of $14,939.80 for its work.  *See* Mot. at 12.  The Liability Provision therefore appears straightforwardly applicable to the instant case and GGW does not offer a plausible alternative interpretation other than to suggest, vaguely, that the Provision is ambiguous.  *See* Opp'n at 22-23.  As the Liability Provision's "language is clear and explicit," however, "and does not involve an absurdity," that unambiguous language leads the Court to conclude that the provision is applicable to GGW's claims.  *See* Cal. Civ. Code §§ 1636, 1638.

GGW argues in the alternative that when "[t]he whole of the contract is taken together," as it must be, a conflict arises between the Liability Provision and the Insurance Provision such that the contract cannot be "carried into effect . . . without violating the intention of the parties."  *See* Cal. Civ. Code §§ 1641, 1643.  There is, however, no fundamental conflict between the two provisions.  The Insurance Provision afforded GGW real value wholly apart from the Liability Provision.  As Enercon explains, the Liability Provision "only applies to claims by GGW *against Enercon* and is silent with respect to insurance." *Id.* (emphasis added).[8]  As the Certificate of

_____

[8] As Enercon observes, the competing proposal for the Phase II investigation that GGW received from the Geologica firm "expressly link[ed] the limitation of liability and insurance terms as GGW [here] claims it wanted" from Enercon.  Reply at 5.  Geologica's proposal stated that its liability "for any damage caused by acts or omissions other than professional negligence [would] not exceed the available coverage under [Geologica's] commercial general . . . liability coverage." *See id.* (quoting Zagon Decl., Ex. 3 at MUB000013-MUB000014).  The Geologica proposal thus explicitly tied any liability that it might have to GGW to the coverage provided by its insurance policy.  The Enercon proposal, in contrast, did not, and GGW does not suggest that it sought to

United States District Court
Northern District of California

Insurance that Enercon provided to GGW states, GGW received coverage under Enercon's CGL, Workers Compensation, and Professional Liability policies for a full year, meaning that GGW would have been indemnified for damages resulting from, for example, personal injuries suffered on the Lafayette property.  *See* Wheeler Decl., Ex. A; Docket No. 85-1, Ex. D at 001034-001055. GGW obtained from the Insurance Provision protection from third party claims as well as claims for worker injuries.  The fact that the losses GGW ultimately incurred were caused by environmental contamination, and that these losses turned out not to be covered due to the Pollution Exclusion, does not mean that the coverage GGW obtained was without substantial value.  Both Liability and Insurance Provisions could apply without one nullifying the other.  The Court therefore concludes that the Liability Provision applies to GGW's claims.

B.      Liability Provision's Enforceability

        The Court finds that the Liability Provision is enforceable.  As Enercon points out, "[l]imitation of liability clauses have long been recognized as valid" under California law.  Mot. at 12 (quoting *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 125 (2015)); *see also Bishay v. Icon Aircraft, Inc.*, 2019 WL 3337885, at *5 (E.D. Cal. July 25, 2019) (stating the same); *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126 (2012) (stating the same). The Ninth Circuit has recognized the prerogative of parties to allocate or limit risk via contract where CERCLA claims are at issue.  *See Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 299 F.3d 1019, 1027-28 (9th Cir. 2002) (affirming the district court's decision to impose full liability on the United States, based on its equitable powers under CERCLA § 113(f), where the government had previously agreed to indemnify its contractor for environmental damages to another private party).  The HSAA, moreover, has been described as "California version[] of CERCLA," *Am. Int'l Corp. v. Ins. Co. of Pa.*, 50 Cal.4th 1370, 1379 (2010), and it "expressly incorporates the same liability standards, defenses, and classes of responsible persons as those set forth in CERCLA," *Coppola v. Smith*, 935 F. Supp. 2d 993, 1011 (E.D. Cal. 2013).  "As such, the HSAA is generally interpreted consistent with CERCLA."  *Id.*  GGW has not cited any authority

_____

negotiate with Enercon to include a term similar to [that] in the Geologica proposal."  *See* Reply at 5.

United States District Court
Northern District of California

1   suggesting that limitation of liability provisions are inapplicable to HSAA claims even though

2   they are permitted with respect to CERCLA claims.  *See* Reply at 6.  As a result, the Court

3   concludes that the Liability Provision is presumptively enforceable.

4       Enercon acknowledges, however, that limitation of liability clauses are unenforceable

5   where they are unconscionable or contrary to public policy, Mot. at 12-13, and GGW has asserted

6   affirmative defenses on these grounds.  The Court, however, finds that GGW has not established a

7   genuine dispute of material fact with respect to either defense.

8       1.       Unconscionability (No. 17)

9       Contracts are unconscionable where they are marked by "an absence of meaningful choice

10  on the part of one of the parties together with contract terms which are unreasonably favorable to

11  the other party."  *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109, 1145 (2013).  The doctrine

12  of unconscionability ensures that contracts, especially contracts of adhesion, do not impose terms

13  that are "unduly oppressive" or "so one-sided as to 'shock the conscience.'"  *See Perdue v.*

14  *Crocker Nat'l Bank*, 38 Cal.3d 913, 925 (1985).  A contract of adhesion is a "standardized

15  contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the

16  subscribing party only the opportunity to adhere to the contract or reject it."  *Graham v. Scissor-*

17  *Tail, Inc.*, 28 Cal.3d 807, 817 (1981) (internal quotation omitted).

18      For a court to refuse to enforce a contract as unconscionable, the party alleging

19  unconscionability must show both procedural and substantive unconscionability.  *Sanchez v.*

20  *Valencia Holding Co.,* 61 Cal.4th 899, 910 (2015).  Procedural unconscionability "concerns the

21  manner in which the contract was negotiated and the circumstances of the parties at that time,"

22  *Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 581 (2007), focusing on whether

23  "oppression or surprise" resulted in "an absence of meaningful choice," *Flores v. Transamerica*

24  *HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001).  Substantive unconscionability, in contrast,

25  focuses on the "effects of the contractual terms and whether they are overly harsh or one-sided."

26  *Id.*  While both procedural and substantive unconscionability must be present, they are evaluated

27  on a "sliding scale," such that "the more substantively oppressive the contract terms, the less

28  evidence of procedural unconscionability is required to come to the conclusion that the term is

United States District Court
Northern District of California

13

1    unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th

2    83, 114 (2000).

3         GGW contends that the Liability Provision is procedurally unconscionable "because the

4    company "received proposals with similar standardized limitation of liability clauses so it did not

5    have a meaningful choice of alternative terms." Opp'n at 19.  And it argues that the provision is

6    substantively unconscionable "because it is one-sided and oppressive to GGW." *Id.* at 20.  These

7    conclusory assertions, the only bases of procedural unconscionability asserted by GGW, are

8    clearly unavailing.  As an initial matter, the parties' agreement is not a contract of adhesion since

9    "Mr. Peacock negotiated to revise the Proposal to include his insurance term to which Enercon

10   agreed" and Enercon never suggested that the proposal was made on a "take it or leave it" basis.

11   *See* Mot. at 15 (citing Zagon Decl., Ex. A at 105:3-10).

12        With respect to procedural unconscionability, Enercon correctly points out "GGW did not

13   have to use Enercon for the Limited Phase II investigation, or even to do the work at all," given

14   that GGW was pursuing the investigation for the sake of refinancing a bank loan.  *See* Reply at 11.

15   "Indeed, GGW could have chosen Geologica and its proposal, which expressly links the limitation

16   of liability and insurance terms in the manner GGW now claims it wanted." *Id.*  Likewise, the

17   lack of oppression, which results from unequal bargaining power, is demonstrated by the fact "that

18   Mr. Peacock negotiated for his insurance term and Enercon accepted." *Id.* (citing *Lara v. Onsite

19   Health Inc.*, 896 F. Supp. 2d 831, 839-40 (N.D. Cal. 2012)).  There is no unconscionability if there

20   was an opportunity to request change as GGW did.  *Markborough California, Inc. v. Superior Ct.*,

21   227 Cal. App. 3d 705, 716, 277 Cal. Rptr. 919 (Ct. App. 1991).

22        GGW has also failed to plausibly show that the Liability Provision is substantive

23   unconscionable.  "The contract was bilateral given that Mr. Peacock negotiated for and received

24   the insurance term GGW wanted in the Agreement." Mot. at 16.  And, as noted above, the

25   insurance coverage that GGW received as an additional insured was far from being worthless, at

26   least when considered *ex ante*.  And GGW has not shown that a limitation on liability as that

27   contained in the consulting contract is unusual or inherently suspect.  Limitations of liability

28   clauses "have long been recognized as valid in California." *Markborough Calif., Inc. v. Superior*

United States District Court
Northern District of California

*Court*, 227 Cal. App. 3d 705, 714 (1991).  "In the majority of commercial situations, courts have upheld contractual limitations on liability, even against claims that the breaching party violated a law or regulation." *CAZA Drilling, Inc. v. TEG Oil & Gas U.S.A., Inc.*, 142 Cal. App. 4th 453, 472 (2006).  *See, e.g., Ryland Grp., Inc. v. Payne Firm, Inc.*, No. 1:04CV381, 2008 WL 11352605, at *2 (S.D. Ohio Mar. 11, 2008) (limitation on liability of consulting form do not violate public policy).  *Id.*  It is true that courts have found that Cal. Civ. Code § 1668 state the policy of "th[e] state [of California] to look with disfavor upon those who attempt to contract away their legal liability to others for the commission of torts." *Blankenheim v. E.F. Hutton & Co.*, 217 Cal. App. 3d 1463, 1471 (1990); *Gardner v. Downtown Porsche Audi* 180 Cal.App.3d 713, 716 (1986).  "This section made it clear a party could not contract away liability for his fraudulent or intentional acts or for his negligent violations of statutory law.  However, a contract exempting from liability for ordinary negligence is valid where no public interest is involved and where no statute expressly prohibits it." *Nunes Turfgrass v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal. App. 3d 1518, 1534; *see City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 756 (*City of Santa Barbara*; (include these if needed) *McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 794 (2008); *Health Net of Cal., Inc. v. Dep't of Health Servs.*, 113 Cal. App. 4th 224, 233 (2003).  There is no sustainable claim of fraud.  Nor is a statutory prohibition violated.  This is not a case where the limitation on Enercon's liability "concerns a service that transcends a purely private agreement and affects the public interest." *City of Santa Barbara,* 41 Cal.4th at 757.

In sum, the terms of the contract does not shock the conscience, and "[a] party cannot avoid a contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain." *See Sanchez*, 61 Cal.4th at 911.

2.    Public Policy (No. 17)

"The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and . . . should be exercised only in cases free from doubt." *Hass v. RhodyCo Prods.*, 26 Cal. App. 5th 685, 697 (2018).  Contracts may be voided where the public interest is significantly undermined, *see Tunkl v. Regents of Univ. of Cal.*, 60 Cal.2d 92, 96 (1963), but in general "private parties are free among themselves to shift a risk

15

elsewhere than where the law would otherwise place it[.]"  *Olsen v. Breeze*, Inc., 48 Cal. App. 4th 608, 619 (1996).  In weighing whether a contract contravenes public policy, the California Supreme Court has held that courts should consider whether:

> (1) the contract concerns a business that is generally thought suitable for public regulation, (2) the party seeking exculpation is engaged in performing a service that is often a matter of practical necessity for some members of the public, (3) the party represents himself as willing to perform the service for any member of the public who seeks it or any member that falls within certain established standards, or (4) the party has superior bargaining power and confronts the public with a standardized adhesion contract with no provision for reasonable fees or protection against negligence.

*Tunkl*, 60 Cal.2d at 99-101.

GGW suggests that the Liability Provision violates public policy "because it was fraudulently obtained" and because Enercon's work on the Phase II investigation failed to comply with federal and state environmental laws.  Opp'n at 20 (citing *Blankenheim v. E.F. Hutton & Co.*, 217 Cal. App. 3d 1463, 1471-72 (Ct. App. 1990) (stating that "a party may not contract away liability for fraudulent or . . . negligent violations of statutory law.")).  *Blankenheim* concerns Cal. Civ. Code § 1668, which states: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."  *Blankenheim*, 217 Cal. App. 3d at 1471.

### 3. Fraudulent Obtainment of the Liability Provision

GGW's reliance on *Blankenheim* in arguing that the Limitation Provision is against public policy because it was fraudulently obtained is not persuasive because the contract's object was not to exempt Enercon from its own fraudulent actions; therefore, § 1668 concerns do not apply to this case. *See Id. at* 1471-73.

There is a distinction between (1) a contract which exempts a party from liability for fraud claims which raise § 1668 concerns and (2) fraud in obtaining such a liability exemption provision.  *Blankenheim*, which held that the limitation provision was void under § 1668 because it "exempt[ed] a party from liability for his own positive assertions," *id.* at 1472, drew this distinction.  The court noted that "the inducement to enter into a limitation of liability provision

16

. . . would be an independent reason [from § 1668] for voiding the waiver agreement." *Id.* at 1473.

Section 1668 does not apply here because GGW did not make a fraud claim and allege that the liability provision exempted Enercon from such a claim.  The Court therefore rejects the argument that the Liability Provision violates to public policy under § 1668.

4.     Violations of Law

GGW also argues that Enercon uses the Liability Provision to contract away liability for violations of statutory law, which is also prohibited under § 1668.  Opp'n at 20.  Under § 1668, "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own . . . violation of law, whether willful or negligent, are against the policy of the law."  *Blankenheim*, 217 Cal. App. 3d at 1471.  However, § 1668 may be superseded by other laws that allow such limitations of liability.  For example, in *Nunes Turfgrass*, the California court considered whether a clause that limited any liability to the purchase price of seeds would be enforceable if a mislabeling occurred in violation of the California Seed Law.  *Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.*, 200 Cal. App. 3d 1518, 1537 (Ct. App. 1988).  The Court held that California Uniform Commercial Code § 2719, which specifically authorizes limitations on damages for commercial loss unless the limitation is unconscionable, prevailed over § 1668 because it is the more specific statute.  *Id.* at 1359.

Similarly, CERCLA § 107(e) expressly permits private parties to allocate liabilities amongst themselves by contract.  42 U.S.C. § 9607(e); *see also Arrow Elecs., Inc. v. E.ON AG*, No. CV 05-2388 SVW (SSX), 2006 WL 8450450, at *8 (C.D. Cal. Sept. 5, 2006).  Section 107(e) specifically deals with indemnification, hold harmless, and similar agreements between parties and specifically provide:

> (1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. **Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.**

In this case, CERCLA § 107(e), which expressly permits parties to allocate liability, supersedes Cal. Civ. Code § 1668.  The Ninth Circuit interpreted § 107(e) it to mean that while

United States District Court
Northern District of California

1    private parties cannot avoid reimbursing the government for cleanup costs, they are free to release

2    liability between themselves. *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454 (9th Cir. 1986).

3    In *Mardan*, the parties entered into a release agreement under which the defendant paid the

4    plaintiff approximately a million dollars in settlement of all claims regarding a purchase

5    agreement of a manufacturing plant. *Id.* at 1456. Two years later, the U.S. Environmental

6    Protection Agency brought an administrative enforcement action against the plaintiff, requiring the

7    plaintiff to clean up the plant site. *Id.* The plaintiff then sued the defendant under CERCLA to

8    recover part of the costs of the cleanup, and the defendant denied liability, claiming that the

9    settlement agreement included a release of CERCLA liability. *Id.*

10   The Ninth Circuit affirmed the district court decision in favor of the defendant and

11   interpreted § 107(e) to mean that private parties are free to contract among themselves with

12   respect to indemnification and contribution. *Id.*; *AMB Properties II, L.P. v. Redevelopment*

13   *Agency of City & Cty. of San Francisco*, No. C 97-00548 CRB, 1998 WL 184283, at *4 (N.D. Cal.

14   Apr. 7, 1998) (citing *Mardan*, 804 F.2d at 1459) (explaining that *Mardan* "found a clear federal

15   public policy interest in permitting the allocation of CERCLA liability among responsible parties.

16   Thus, there is no reason under state law why parties cannot contract to transfer liability for

17   environmental pollution."). The Ninth Circuit also noted that, "since CERCLA releases are likely

18   to be entered into by major companies, there is little need for a special federal rule to protect

19   releasors of CERCLA recovery rights from their own ignorance or weak bargaining power."

20   *Mardan*, 804 F.2d at 1460.

21   As CERCLA § 107(e) expressly permits private allocation of CERCLA liability, it

22   supersedes § 1668 like *Nunes Turfgrass*. The same reasoning applies to GGW's claim under the

23   HSAA, the California equivalent of CERCLA. *See Orange Cty. Water Dist. v. Sabic Innovative*

24   *Plastics US, LLC*, 14 Cal. App. 5th 343, 371, 222 Cal. Rptr. 3d 83, 109 (2017). "A claim under

25   the HSAA has the same elements as a claim under CERCLA" and "is interpreted consistent with

26   CERCLA." *Id.* "[The HSAA] provides that [a]ny person who has incurred removal or remedial

27   action costs in accordance with [the] chapter or the federal act may seek contribution or indemnity

28   from any person who is liable pursuant to [the] chapter." *United Alloys, Inc. v. Baker*, 797 F.

1   Supp. 2d 974, 1004 (C.D. Cal. 2011) (quoting Cal. Health & Saf. Code § 25363(e)) (internal

2   quotation marks omitted).  GGW seeks indemnification and contribution for Enercon's conduct

3   rising under the HSAA, including violations of the Cal. Water Code, Cal. Health & Safety Code

4   and Cal. Civ. Code.  FAC at 11.  Private allocation is also permitted for GGW's HSAA claims

5   because CERCLA, as HSAA's federal equivalent, controls.  *See id.* (holding that when HSAA

6   granted contribution but CERCLA precluded recovery, the plaintiff did not have the right to

7   recover costs under both statutes because CERCLA preempted the HSAA).

8        In addition, California courts have recognized the difference between clauses that prohibit

9   the recovery of "any damages at all . . . for regulatory violations[,]" exempting parties "completely

10  from responsibility[,]" and those that "merely limit its responsibility with respect to economic

11  damages" like this case.  *Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688,

12  692 (9th Cir. 1992) (citing *Mardan*, 804 F.2d at 1459).

13       In *CAZA*, the California court found significant that the limitation of liability clause

14  required the defendant to accept responsibility for certain damages related to its pollution activities

15  and "did not adversely affect the public or the workers[,]" in holding that a limitation of liability

16  clause was not void under § 1668.  *CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A.,*

17  *Inc.*, 142 Cal. App. 4th 453, 475 (2006).  The *Caza* Court relied on several cases arising out of

18  aircraft crashes which upheld limitation of liability provisions despite the manufacturers' negligent

19  violations of regulations, finding that the manufacturers were still answerable to the Federal

20  Aviation Administration.  *Id.* at 473-5 (citing *Delta Air Lines, Inc. v. McDonnell Douglas*

21  *Corporation*, 503 F.2d 239, 244 (5th Cir.1974) (discussing § 1668 and noting that "[the

22  manufacturer] is still answerable to the FAA and third parties for any responsibility established by

23  the regulation, and any statutory right of action that might be given to [the airline] by FAA

24  regulations has not been abrogated."); *Philippine Airlines, Inc. v. McDonnell Douglas Corp.*

25  (1987) 189 Cal.App.3d 234, 242 ("[A] manufacturer ... is still answerable to the Federal Aviation

26  Commission.")).

27       Similarly, under CERCLA and the Ninth Circuit's interpretation of it, "all responsible

28  parties will be fully liable to the government regardless of the [] contracts they have entered into."

United States District Court
Northern District of California

19

*Mardan*, 804 F.2d at 1459.  "Such agreements cannot alter or excuse the underlying liability, but can only change who ultimately pays that liability.  Moreover, regardless of how or under what law these agreements are interpreted, the result cannot prejudice the right of the government to recover cleanup or closure costs from any responsible party."  *Id.*  Here, the Liability Provision "applies as between Enercon and GGW only as part of a voluntary, arms-length transaction and has no effect on public agencies or the public at large."  Mot. at 17; *see also* Reply at 12 (noting that the provision "does not prevent a state or federal agency from taking an enforcement action against Enercon or limit their recovery from Enercon").  Moreover, "GGW only contracted for the Limited Phase II work to obtain a cash-out loan," and "was not required to conduct th[e] investigation by a regulator."[9]  Mot. at 17.  For the foregoing reasons, the Court rejects the argument that the Liability Provision is void as contrary to public policy for violations of the law.

C.     GGW's Affirmative Defenses

As noted above, GGW contends that Liability Provision is unenforceable on the grounds of several affirmative defenses.  The Court has addressed GGW's defenses based on unconscionability and public policy above, and it proceeds to the others below.  As GGW bears the burden of proof at trial on its affirmative defenses, Enercon can succeed on its summary judgment motion by demonstrating GGW's failure "to make a showing sufficient to establish the existence of an element essential to [its] case."  *See Celotex Corp,* 477 U.S. at 322.

1.     Lack of Meeting of the Minds (No. 14)

A meeting of the minds occurs when there is "a definite proposal made by one side which was unqualifiedly accepted by the other."  *Imperial Water Co. No. 1 v. Imperial Irr. Dist.*, 62 Cal. App. 286, 288 (1923).  "California recognizes the objective theory of contracts, under which it is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation."  *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003) (internal quotations

---

[9] The California agency for the cleanup of contamination at the Subject Property issued a Cleanup and Abatement Order to GGW and prior property owners and operators of the dry-cleaning facility in 2011 and did not include Enercon.  Reply at 12-13.

United States District Court
Northern District of California

1  and citations omitted).  "The parties undisclosed intent or understanding is irrelevant to contract

2  interpretation."  *Id.*  As a result, "one who assents to a contract is" generally "bound by its

3  provisions and cannot complain of unfamiliarity with [its] language."  *Madden v. Kaiser Found.*

4  *Hosps.*, 17 Cal.3d 699, 710 (1976).  Moreover, California evidence law also provides that "facts

5  recited in a written instrument are *conclusively presumed to be true* as between the parties thereto"

6  (unless the facts "apply to the recital of a consideration").  Cal. Evid. Code § 622 (emphasis

7  added); *see also* Fed. R. Evid. 302 ("In a civil case, state law governs the effect of a presumption

8  regarding a claim or defense for which state law supplies the rule of decision.").

9      GGW does not explicitly address its meeting-of-the-minds affirmative defense in its

10  opposition, which could be construed as a waiver of the defense.  In any event, its defense is

11  meritless.  Its basic theory overlaps with its fraud-based defenses, which focus on Enercon's

12  purported failure to inform GGW of the environmental risks of the Phase II investigation and of

13  the Pollution Exclusion in Enercon's insurance policy, which rendered the Insurance Provision

14  "meaningless."  *See* Opp'n at 1.  GGW stresses that Mr. Peacock and GGW "had no

15  environmental experience" prior to contracting with Enercon, that they "believed that the

16  insurance would cover Enercon's mistakes and/or negligence" in conducting the investigation, and

17  that "Enercon led GGW to believe that it was providing insurance unconditionally."  *Id.* at 1, 8,

18  13.  GGW thus posits that "mutual assent" did not exist here because "Enercon did not intend to

19  adequately protect against risks associated with its work when it chose a policy with a pollution

20  exclusion."  *Id.* at 12.

21      These arguments, however, are unavailing with respect to whether there was a meeting of

22  the minds, as they concern "the subjective intent of one of the parties" rather than "the words of

23  the contract."  *See Newport Beach Country Club*, 109 Cal. App. 4th at 956.  Under the objective

24  standard applicable here, the undisputed facts establish a contract.  The contract was negotiable,

25  signed and then performed.  As described above, during the multi-day negotiation period "Mr.

26  Peacock looked at the Proposal, called Mr. Wharff to ask questions and negotiate changes, made

27  the changes GGW wanted, signed for GGW and then sent the fully signed Agreement to

28  Enercon."  Mot. at 14 (citing Zagon Decl., Ex. A at 101:14-106:25; 110:4-117:24); *see also* Opp'n

United States District Court
Northern District of California

at 11 (acknowledging that "GGW read the contract in some detail" during negotiations).  The

Liability Provision, moreover, "is contained in a simple, 3-page Agreement in easy-to-read print,

is plainly written[,] and contains no hidden terms."  Reply at 2 (citing Zagon Decl., Ex. D).  In

addition, GGW subsequently "allowed Enercon on the Subject Property to perform the Limited

Phase II investigation work, Enercon performed the work, and GGW paid Enercon for performing

the work."  Mot. at 14 (citing, *e.g.*, Zagon Decl., Ex. A at 115:19-23).  Consequently, the Court

finds that was there was "a definite proposal made by [Enercon] which was unqualifiedly accepted

by [GGW]," and that a meeting of the minds therefore occurred between the parties.  *See Imperial*

*Water Co.*, 62 Cal. App. at 288.

### 2.   Fraud-Based Defenses (Nos. 29-33)

GGW asserts five fraud-based affirmative defenses to Enercon's limitation of liability

defense, including (1) fraud in the inducement (No. 29), (2) fraud in the factum (No. 30), (3)

constructive fraud/negligent misrepresentation (No. 31), (4) promissory fraud (No. 32), and (5)

concealment (No. 33).  As these defenses share certain common elements they will be addressed

collectively, with reference made to specific defenses where necessary.

Under California law, "[t]he elements of fraud, which give rise to the tort action for deceit,

are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of

falsity (or 'scienter'); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e)

resulting damage." *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996) (quoting 5 Witkin,

Summary of Cal. Law (9th ed. 1988) Torts § 676); *see also* Cal. Civ. Code ¶ 1709 ("One who

willfully deceives another with intent to induce him to alter his position to his injury or risk, is

liable for any damage which he thereby suffers.").  In contrast to affirmative misrepresentations,

concealment or nondisclosure "may constitute actionable fraud" in four circumstances: "(1) when

the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive

knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a

material fact from the plaintiff; and (4) when the defendant makes partial representations but also

suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).  While

Cal. Civ. Code § 1574 states that actual fraud has occurred "is always a question of fact," a

United States District Court
Northern District of California

"question of fact" is not necessarily a "triable issue of material fact." *Sanders v. Sung I. Chun*, No. B284704, 2018 WL 6616228, at *5 (Cal. Ct. App. Dec. 18, 2018) ("Although fraud is a question of fact, where there is insufficient evidence to allow a factfinder to find in favor of the plaintiff, summary judgment is appropriate.  The statute declaring that fraud is "always a question of fact" is not a legislative requirement that every allegation of fraud must proceed to trial.").  As the court noted in *Guido v. Koopman*, 1 Cal. App. 4th 837 (1991), while the existence of actual fraud is always a question of fact under Civ. Code, § 1574, elements of fraud "may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts[,]" and that the plaintiff's reliance was unreasonable.  *Id.*

GGW's fraud defenses are based on Enercon's purported failure to disclose (1) the risk of environmental contamination associated with the Phase II investigation and (2) the fact that Enercon's CGL policy contained the Pollution Exclusion and was therefore "meaningless."  *See* Opp'n at 1.  Regarding the first, GGW argues that Enercon's proposal contained an affirmative misrepresentation by stating, in the Limitation Provision, that the parties "ha[d] discussed the risks and rewards associated with" the investigation.  Opp'n at 3, Zagon Decl., Ex. C at MUB000005.  The statement was false, GGW contends, because it was prepared prior to the conversation between Mr. Peacock and Mr. Wharff, *i.e.*, before GGW and Enercon had ever communicated.  *See* Opp'n at 3.  Further, GGW points to testimony from Mr. Walker, Enercon's designated deponent in this matter, who acknowledged that he was unaware of any specific discussions between GGW and Enercon regarding either the risks or the rewards of the Phase II investigation.  *See id.* at 5-6 (quoting Greben Decl., Ex. 5 at 74:19-80:20).  Thus, "apart from the vague reference to 'the risks and rewards' in the Limitations Provision, Enercon . . . failed to discuss any with GGW."  *Id.* at 7.  GGW explains, "GGW, Peacock Construction, nor Mr. Peacock had ever been part of any type of environmental matter or contract prior to the contract with Enercon," and they were thus unaware that "Enercon could spread contamination that could potentially cost more than the value of the loan itself."  *Id.* at 10, 14.  GGW thus avers that it "would not have agreed to the limitation of liability had it been aware of such potential calamity."  *Id.* at 7.

GGW's theory of fraud with respect to risk disclosure is unavailing.  First, as Enercon

23

stresses, California evidence law provides that "facts recited in a written instrument are conclusively presumed to be true as between the parties thereto," except where the facts merely recite a consideration.  *See* Cal. Evid. Code § 622.  As the "Limitations" section of Enercon's proposal and the parties' ultimate agreement expressly states that GGW and Enercon "ha[d] discussed the risks and rewards associated with th[e] project," Zagon Decl., Ex. C at MUB000005; *id.*, Ex. D, GGW is estopped from claiming otherwise.  *See Plaza Freeway Ltd. P'ship v. First Mountain Bank*, 81 Cal. App. 4th 616, 628 (2000) (holding that, under § 622, "facts contained in [an estoppel] certificate "are conclusively presumed to be true" even if the "certificate contains an erroneous recitation" of such facts).

There is an exception to this conclusive presumption "in cases where the contract is alleged to be unconscionable," as in a contract of adhesion, "situations not involving arm's length negotiations."  *See, e.g.*, *McKellar v. Mithril Cap. Mgmt. LLC*, 2020 WL 1233855, at *8 (N.D. Cal. Mar. 13, 2020) (involving an allegedly unconscionable adhesion contract); *In re Marriage of Clarke & Akel*, 19 Cal. App. 5th 914, 921 (2018) (stating the rule regarding arm's length negotiations).  But as discussed above, the contract here was not unconscionable, and it was an arms-length negotiation as GGW had an alternative vendor and negotiated terms of the agreement with Enercon.

Some courts have held that § 622 "does not bar an assertion of fraud or other grounds for rescission of a contract," in addition to claims that the contract is one of adhesion.  *See Citizens Bus. Bank v. Gevorgian*, 218 Cal. App. 4th 602, 625 (2013) (citing *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1291 (2008)).  Even if § 622 does not preclude GGW from challenging the risk-disclosure statement in the "Limitations" section, "fraud does not render a written contract void where the defrauded party had *a reasonable opportunity to discover the real terms* of the contract."  *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal.4th 394, 419-20 (1996) (emphasis added); *see also id.* at 420 ("[M]isrepresentation does not render the contract *void* unless the misled party, before making the agreement, lacked a reasonable opportunity to learn its terms.")

(emphasis in original).[10]  Here, it cannot reasonably be disputed that GGW had ample notice that there were *some* risks associated with the Phase II investigation.  First, it was necessitated by Union Bank's refusal to refinance the loan on GGW's property unless GGW hired an environmental consulting firm "to determine whether dry cleaning contamination was present" at the site.  *See* Mot. at 6 (citing Zagon Decl., Ex. A at 73:15-74:5, 81:6-82:16, 91:6-15), Opp'n at 2. GGW therefore had clear reason to suspect that there was a "potential for contamination" in spite of its evident inexperience with environmental testing.  *See id.*  Second, GGW was alerted to the possible risks of the investigation – the agreement referred in the "Limitations" provision to "injuries, damages, claims, losses, expenses or claim expenses" that could result from the company's work.  *See* Zagon Decl., Ex. D.  Immediately above the "Limitations" provision, the agreement contains a separate section devoted to Enercon's "Site Safety Plan," which refers, *inter alia*, to the need to maintain a "Safety, Health, and Emergency Response Plan" for the site and to the use of "OSHA Level 'D' protective clothing."  *Id.*  Of course, the very fact that the agreement contained a strict limitation on Enercon's potential liability further served to provide notice to GGW that there were risks from Enercon's pollution investigation.

Despite these indications, "Mr. Peacock did not ask any questions" of Mr. Wharff or anyone else at Enercon during negotiations over the agreement.  *See* Reply at 10.  Even if the provision stating discussions of the risks and the non-disclosure of the risks were somehow fraudulent, no claim for fraud could like because GGW neglected "a reasonable opportunity to discover the real terms of the contract."  *See Rosenthal*, 14 Cal.4th at 419-20.  Indeed, the failure to make any kind of inquiry in light of Mr. Peacock's experience in managing real properties and

---

[10] *Rosenthal* noted the distinction between fraud in the execution, which seeks a judicial determination that a contract is void, versus fraud in the inducement, which seeks equitable relief such as rescission or reformation.  *See id.* at 419-23.  The rule from *Rosenthal* applies to the former but not *necessarily* to the latter.  Other courts have withheld judgment on whether a party's negligence in ascertaining the terms of a contract prevents it from seeking equitable relief on a fraud in the inducement claim.  *See also Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal.4th 1169, 1184 n.11 (2013).  In the latter cases, "a defendant who misrepresents the facts and induces the plaintiff to rely on his statements should not be heard in an equitable action to assert that the reliance was negligent unless plaintiff's conduct, in light of his intelligence and information, was preposterous or irrational."  *Van Meter v. Bent Constr. Co.*, 46 Cal.2d 588, 594 (1956); *Rosenthal*, 14 Cal.4th at 422-23.  Here, it is not clear whether GGW is seeking to void its contract with Enercon or to rescind it.

1    construction was unreasonable.  *Van Meter*, 46 Cal. 2d at 594.

2          There is no evidence or any reasonable inference that can be drawn that Enercon had an

3    intent to defraud GGW and to induce GGW's reliance.  If anything, reciting the parties had

4    discussed the risks of the project, would have alerted GGW to the facts that there are risks to

5    discuss, hardly evidence of an attempt to conceal the existence of risks by Enercon and a

6    concomitant intent to induce reliance.  The same is true, for the reasons stated above, for the

7    agreement's express limit on liability.  *See* Zagon Decl., Ex. D; *see also* Reply at 11 ("If a

8    statement about discussion of risks in the 3-page Agreement was not accurate 12 years ago, Mr.

9    Peacock had an obligation to say so before signing the Agreement for GGW.").  Put another way,

10   it makes little sense for GGW to claim—as it must to succeed on its fraud defenses—that it

11   justifiably relied on a statement that it also contends was manifestly untrue at the time that Mr.

12   Peacock was negotiating the agreement.  Similarly, as stated above, any reliance by GGW was not

13   justified; GGW had a duty to "make [a] reasonable inquiry to ascertain . . . the meaning and

14   content of the contract upon which [it] relie[d]."  *See Wal-Noon Corp.*, 45 Cal. App. 3d at 615.

15         The Court therefore concludes that GGW has failed to raise a genuine issue of material fact

16   as to whether the agreement's risk-disclosure statement was fraudulent.[11]

17         The Court finds that GGW's second fraud-based argument—*i.e.*, that Enercon failed to

18   disclose the existence of the Pollution Exclusion is also meritless.  As previously discussed,

19   GGW's theory is that Enercon had a duty to disclose "that the insurance it was adding for GGW

20   was meaningless because it had a pollution exclusion in it, depriving GGW of any coverage for

21   Enercon's malfeasance."  Opp'n at 1; *see also id.* at 13 (stating that Enercon "never disclosed that

22   it was giving [GGW] something that was meaningless to protect GGW"), *id.* at 20 (stating that

23   "GGW would not have agreed to the meaningless insurance obligation" had it known of the

24   Pollution Exclusion).  For reasons the Court has already given, GGW's insistence that it did not

25

26   _____

27   [11] GGW twice argues in its opposition that Enercon "created a duty to disclose the material risks" of the investigation by placing the risk-disclosure statement in the agreement.  *See* Opp'n at 11, 17.  But GGW cites no authority for this proposition, which does not comfortably fit within any of the aforementioned categories establishing a duty to disclose.  *See LiMandri*, 52 Cal. App. 4th at 336.

28

receive "something of value under the Insurance Provision" is simply inaccurate.  GGW received

a year's worth of CGL and workers compensation insurance under Enercon's policy, which was

valuable consideration at the time of contract formation.  GGW's suggestions that Enercon

committed fraud because it somehow failed to provide GGW with *any* insurance, *see* Opp'n at 17-

19, are therefore entirely baseless.

    GGW's more pertinent argument is that Enercon knew, based on Mr. Peacock's direct

statement to Mr. Wharff, that GGW required wanted the insurance policy "to cover *any* problems"

associated with the Phase II investigation, and that Enercon's failure to disclose the Pollution

Exclusion was therefore fraudulent.  *See* Opp'n at 4.  GGW thus avers that it "would not have

signed the contract without a promise from Enercon to provide insurance in the event *a problem*

arose."  *Id.* at 7 (emphasis added).  Its evidentiary support for these contentions is a declaration

that Mr. Peacock filed along with GGW's opposition.  In the declaration, Mr. Peacock states that,

during his conversation with Mr. Wharff, he advised "that to proceed with the contract with

Enercon" Mr. Peacock "wanted to add an insurance term in the event a problem arose with

[Enercon's] work on [his] property."  Docket No. 84-2 ("Peacock Decl.") ¶ 15.  Mr. Peacock

states that, in response, "Mr. Wharff agreed to the insurance term and directed [him] to write it

into the proposal [and] to sign and return the proposal to him."  *Id.* ¶ 17.  Mr. Peacock further

represents that, based on his "discussion with Mr. Wharff and the additional insurance provision,

[he] understood that Enercon had provided insurance coverage for any problems that might arise

as a result of their work on the property" and that "the full amounts of the policy limits set forth in

the certificate [of insurance] were available . . . if there was a problem arising from their work."

*Id.* ¶ 21.

    As Enercon points out, however, the contention that Mr. Peacock made clear to Mr. Wharff

that he sought insurance coverage for any and all problems relating to the investigation is not

supported by his declaration.  He merely states he wanted to add an insurance term "in the event of

a problem arose with work on his property."  Peacock Decl. ¶ 15.  He did not say he wanted

coverage for "any and all problems."  If Mr. Peacock had declared he made such a sweeping

statement, it would be contradicted by his own earlier deposition testimony which included the

following exchange:

> Q.  Mr. Peacock, with respect to the insurance provision, it instructed Enercon to make—make Plaintiff an additional insured on its general liability policy, correct?
>
> A.  Yes.
>
> Q.  *You didn't specify any particular coverage or that you wanted it to cover any and all potential risks of what could happen out there in what you handwrote on the contract, correct?*
>
> A.  *That's correct.*
>
> Q.  And they—and you were named as an additional insured on the GL policy, correct?
>
> A.  Yes.
>
> Q.  *Did you ever ask Mr. Wharf [sic] if the general liability policy would cover all risks of the Phase 2 investigation work?*
>
> A.  No.
>
> Q.  No, as in you did not ask him that question, correct?
>
> A.  *I didn't ask him that question.*

Zagon Decl., Ex. A at 119:14-120:8 (emphasis added).  Similarly, when Mr. Peacock was asked whether he asked Mr. Wharff "about any of [the] provisions in the proposal," he responded that he "wanted to add the additional insurer term" that he eventually wrote into the agreement.  *Id.* at 104:12-20.  When Mr. Peacock was then asked whether he told Mr. Wharff anything else regarding specific terms in the contract, Mr. Peacock stated that he "didn't tell [Mr. Wharff] anything."  *Id.* at 104:25-105:2.  Mr. Peacock therefore expressly recounted, during his deposition, that he did not tell Mr. Wharff he wanted the insurance to cover all potential risks of the Limited Phase II investigation work, nor did Mr. Peacock ask if the general liability policy would cover all risks associated with the Phase 2 investigation work.

To the extent there is tension between Mr. Peacock's deposition testimony and his subsequent declaration, Enercon argues that the declaration should be disregarded under the "sham" affidavit rule.  *See* Reply at 3, 7.  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  The Ninth Circuit explained

that "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (internal quotation omitted). The court cautioned, however, that the general rule "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony." *Id.* at 267. If such an affidavit results from "an honest discrepancy, a mistake, or . . . newly discovered evidence," then a district court should weigh it as part of a summary judgment motion. *Id.* "[T]he district court must make a factual determination" that a contradictory affidavit "was actually a 'sham'" in order to disregard it for purposes of summary judgment. *Id.* Enercon contends that Mr. Peacock's declaration is a sham under the Ninth Circuit's standard, especially since Mr. Peacock did not "include any explanation of the inconsistency in his declaration with his prior sworn deposition testimony and he did not make any corrections on his deposition transcript." Reply at 7 n.3. The Court agrees. To the extent Mr. Peacock's declaration may be interpreted as stating he told Mr. Wharff he wanted insurance coverage for any and all possible problems (an interpretation the Court finds cannot reasonably be inferred), that testimony must be disregarded as sham.

Even if that testimony, so construed, were considered, there is no evidence (or any reasonable inference) that Enercon knew what GGW intended when it asked for insurance or was on notice that GGW wanted insurance to cover all potential risks. The fact that Mr. Peacock *himself* concluded from his conversation with Mr. Wharff that the insurance term he was to add would protect GGW from all forms of liability that could arise from the Phase II investigation (Peacock Decl. ¶¶ 15-16, 21) does not prove the existence of a genuine issue of material fact as to whether *Enercon* shared that belief, a belief necessary to GGW's fraud claim.

Nor is there a basis for a claim based on concealment. GGW has not produced facts indicating that Enercon and GGW shared a fiduciary relationship or that Enercon actively concealed or suppressed material information about its insurance policies. GGW's only plausible basis for claiming that Enercon's nondisclosure of the Pollution Exclusion was an actionable misrepresentation is Enercon's "exclusive knowledge of material facts not known to the plaintiff."

29

*See LiMandri*, 52 Cal. App. 4th at 336.  But because GGW has failed to produce evidence showing that Enercon knew about the type of insurance GGW wanted, its purportedly exclusive knowledge of the Pollution Exclusion in and of itself does not establish fraudulent concealment.

Further, GGW could not have justifiability relief on any such non-disclosure.  The Certificate of Insurance issued says nothing about pollution coverage and cautions [that] "the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies"—coverage limitations that GGW never sought to discover.

Thus, GGW has not established a basis for claiming that Enercon knew that GGW required insurance coverage for all risks associated with the Phase II investigation including Pollution Coverage, that Enercon acted with scienter in failing to disclose the Pollution Exclusion, or that the nondisclosure was intended to induce and did induce justifiable reliance.  GGW's fraud-based defenses concerning Enercon's nondisclosure of the Pollution Exclusion fail to raise a genuine issue of material fact.  Enercon is entitled to partial summary judgment on the fraud claims.

For the sake of completeness, the Court reviews the particular requirements for the various fraud defenses that GGW asserts below.

### a.  Fraud in the Inducement (No. 29)

Fraud in the inducement occurs when "the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*."  *Ford v. Shearson Lehman Am. Express, Inc.,* 180 Cal. App. 3d 1011, 1028 (1986) (emphasis in original).  "The elements of fraud in inducement of a contract are the same elements as actual fraud."  *Hidalgo v. Aurora Loan Servs. LLC*, 2013 WL 4647550, at *4 (S.D. Cal. Aug. 29, 2013).  As the elements of this claim are identical to those for actual fraud, the foregoing analysis applies here with equal force.

### b.  Fraud in the Factum (No. 30)

Fraud in the factum is based on the "procurement of the execution of a note or bill as results in the signer's being ignorant of the *nature* of the instrument he is signing."  *Frusetta v. Hauben*, 217 Cal. App. 3d 551, 556 (1990) (internal quotation omitted) (emphasis in original).  "The theoretical basis of the defense of fraud in the factum is the absence of a 'meeting of the

*United States District Court*
*Northern District of California*

minds,' the mutual assent necessary to the creation of a binding contract." *Id.* As the Court explained with respect to GGW's standalone meeting-of-the-minds affirmative defense, the parties gave their mutual assent to the Phase II investigation agreement, making this defense unavailing.

### c.   Constructive Fraud/Negligent Misrepresentation (No. 31)

Constructive fraud has the same elements of actual fraud "with the exception that there is no requirement of intent to induce reliance." *Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 845 (2016); *see also Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997) ("False representations made recklessly and without regard for their truth in order to induce action by another are equivalent of misrepresentations knowingly and intentionally uttered."). Further, constructive fraud "is a unique species of fraud applicable only to a fiduciary or confidential relationship." *Michel v. Moore & Assocs., Inc.*, 156 Cal. App. 4th 756, 762 (2007). The elements of a negligent misrepresentation, meanwhile, are the same as those of actual fraud, except that there is no scienter requirement. *See Borman v. Brown*, 59 Cal. App. 5th 1048, 1060 (2021). Instead, it requires only a showing that a defendant made a misrepresentation "without reasonable ground for believing it to be true." *Id.* As Enercon's risk-disclosure statements and nondisclosure of the Pollution Exclusion were, *inter alia*, not actionable misrepresentations, GGW cannot assert defenses based on either constructive fraud or negligent misrepresentation.

### d.   Promissory Fraud (No. 32)

"One of the forms of actual fraud is a promise made without any intention of performing it." *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal.4th 1169, 1173 n.3 (2013) (internal quotation and brackets omitted). To succeed on an affirmative defense of promissory fraud, therefore, "proof of intent not to perform is required." *Id.* at 1183. "The intent element of promissory fraud entails more than proof of an unkept promise or mere failure of performance." *Id.* Here, GGW fails to provide evidence showing that Enercon did not intend to perform its duties under the Phase II investigation agreement. To the contrary, Enercon provided GGW with a full year of CGL and workers compensation insurance coverage, which is what the Insurance Provision added by GGW expressly required. As the Court explained above, this was far from a meaningless promise even if the Pollution Exclusion ultimately operated to deny GGW

coverage for the damages arising from Enercon's consulting work in this instance.

e.     Concealment (No. 33)

The required elements for fraudulent concealment are: "(1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact." *Graham v. Bank of America, N.A.,* 226 Cal.App.4th 594, 605 (2014).  For the reasons stated above, GGW cannot establish fraudulent concealment.

3.     Mistake (No. 20)

California law provides that a "mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake."  Cal. Civ. Code § 1577.  If both parties are mistaken and "neither is at fault or both are equally to blame, the mistake may prevent formation of the contract."  *Balistreri v. Nev. Livestock Prod. Credit Ass'n,* 214 Cal. App. 3d 635, 642 (1989).  Where a mutual mistake "is material and goes to the essence of the contract, relief will be granted to the one against whom it is sought to be enforced."  *Estate of Barton*, 96 Cal. App. 2d 234, 239 (1950).  California law allows the recission of a contract for a unilateral mistake, however, only "when the unilateral mistake is known to the other contracting party and is encouraged or fostered by that party."  *Merced Cnty. Mut. Fire Ins. Co. v. State of Cal.*, 233 Cal. App. 3d 765, 772 (1991).  Further, recovery for a unilateral mistake of fact will be precluded if a party fails "to make reasonable inquiry to ascertain or effort to understand the meaning and content of the contract."  *See Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 615 (1975).  Particularly where the terms of an agreement are clear, moreover, "no law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract."  *Rowland v. PaineWebber Inc.,* 4 Cal. App. 4th 279, 286 (1992).  To prevail on mistake defense, the party asserting the defense must prove it through clear and convincing evidence.  *Nash v. UCSF Med. Ctr.*, 2013 WL 4487503, at *2 (N.D. Cal. Aug. 19, 2013).  Here, GGW fails to clearly identify any mutual mistake.  "There is no evidence that Enercon was mistaken about the

limitation of liability provision or the insurance term added to the Agreement by GGW."  Mot. at 18.

As to any claim of unilateral mistakes by GGW based on the contention that "Enercon knew that GGW would not proceed unless Enercon provided insurance" and that "GGW would rely on its representations that GGW was covered,"  Opp'n at 18-19, Enercon *did* provide GGW with insurance coverage in the form of a full year's worth of CGL and workers compensation insurance (subject to the Pollution Exclusion).

To the extent GGW claims unilateral mistake regarding the scope of insurance coverage, for the reasons discussed above, there is no cognizable evidence or basis to infer that any such misunderstanding by GGW was known to, encouraged or fostered by Enercon.  Nor has GGW adduced any evidence showing that it made a "reasonable inquiry to ascertain or effort to understand the meaning and content of the contract" it signed.  *See Wal-Noon Corp.*, 45 Cal. App. 3d at 615.  As Enercon observes, Mr. Peacock had three days to review Enercon's proposal regarding the Phase II investigation and had "a full opportunity to . . . ask questions" about its key terms in his conversation with Mr. Wharff.  *See* Mot. at 18.  During their phone call, however, Mr. Peacock admittedly asked only whether Enercon was available to begin work on the project quickly and whether Mr. Peacock could insert the Insurance Provision into the contract.  *See* Mot. at 6; Zagon Decl., Ex. A at 104:12-105:10.  Mr. Peacock appears never to have addressed with Mr. Wharff or any other agent of Enercon the nature and scope of either the Liability or Insurance Provisions.  He never asked for a copy of the policy.  There is also no evidence suggesting that GGW sought information from Enercon's insurer about the terms of the CGL and workers compensation policies on which it was an additional insured.  Yet, as an experienced property manager who admittedly signed over a thousand contracts as President of Peacock Construction, he must have been aware that commercial insurance policies are commonly modified by riders, addenda, etc., and that many types of coverage are often excluded.

GGW fails to demonstrate the existence of a dispute of material fact regarding its unilateral mistake defense—especially given that GGW is required to prove the defense by clear and convincing evidence.

United States District Court
Northern District of California

1    4.    Unclean Hands (No. 26)

2        Under the "unclean hands" doctrine, a party is barred from obtaining relief if it has

3    engaged in unconscionable conduct directly related to a transaction or matter before a court.

4    *DeRosa v. Transamerica Title Ins. Co.,* 213 Cal. App. 3d 1390, 1395 (1989).  In order to establish

5    an unclean hands defense, therefore, the party asserting the defense must demonstrate (1) that the

6    opposing party engaged in unconscionable, bad faith, or inequitable conduct, and (2) that the

7    conduct directly relates to the claim that the opposing party has asserted.  *See Kendall-Jackson*

8    *Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (2000).

9        In its opposition, GGW states simply that "Enercon did not act in good faith when it misled

10   and induced GGW to enter the contract with unfair and surprise terms."  Opp'n at 22.  This charge

11   evidently refers to GGW's broad contention that the Insurance Provision was meaningless because

12   of the Pollution Exclusion, which Enercon failed to disclose.  As the Court ruled above, however,

13   GGW has failed to establish any reasonable basis for its claim that the parties' agreement was

14   either procedurally or substantively unconscionable.  Nor is there any evidence of bad faith by

15   Enercon to provide a basis for an unclean hands defense.  The limitation on liability was plain on

16   the face of the contract and could not be deemed a surprise.  To the extent that the Pollution

17   Exclusion can be considered a term of the *contract* itself, rather than Enercon's insurance policy as

18   an independent document, it was not so one-sided as to have "lack[ed] a modicum of bilaterality."

19   *See Lara*, 896 F. Supp. 2d at 841.  As discussed, the insurance policy even with the exclusion had

20   real value to GGW.

21       The Court therefore finds that GGW has not shown that there exists a genuine dispute of

22   material fact as to its unclean hands defense.

23   5.    Waiver (No. 27)

24       As this Court has previously explained, "the doctrine of waiver refers to 'the intentional

25   relinquishment of a known right after full knowledge of the facts and depends upon the intention

26   of one party only.'"  *Jay v. Serv. Emps. Int'l Union–United Healthcare Workers W.*, 2017 WL

27   3670781, at *6 (N.D. Cal. Aug. 25, 2017) (quoting *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum*

28   *Café & Takeout III, Ltd.*, 30 Cal. App. 4th 54, 59 (1994)).  "This is a difficult standard to meet

34

1   because '[w]aiver always rests upon intent,' and the burden 'is on the party claiming a waiver of

2   right to prove it by clear and convincing evidence that does not leave the matter to speculation.'"

3   *Id.* (quoting *DRG/Beverly Hills*, 30 Cal. App. 4th at 59) (brackets in original).

4          Here, GGW suggests that "Enercon waived its right to the Limitations Provision . . . when

5   it agreed to the Insurance Provision." Opp'n at 22. As discussed above, however, the two

6   provisions are not incompatible or otherwise inconsistent, and the Court may "give effect to every

7   part" of the agreement "without violating the [objective] intention of the parties." *See* Cal. Civ.

8   Code §§ 1641, 1643. The Insurance Provision made no promise or representation about coverage

9   for liability stemming from pollution. Thus, no waiver can be inferred.

10          GGW has not provided any facts, let alone clear and convincing evidence, to demonstrate

11   that Enercon intentionally relinquished its right to assert the limitation of liability defense, the

12   Court rejects GGW's waiver defense as a matter of law.

13          6.      Estoppel (No. 28)

14          "[T]he doctrine of '[e]stoppel is applicable where the conduct of one side has induced the

15   other to take such a position that it would be injured if the first should be permitted to repudiate its

16   acts.'" *Jay*, 2017 WL 3670781, at *6 (quoting *DRG/Beverly Hills*, 30 Cal. App. 4th at 59)

17   (brackets in original). "Estoppel requires showing that '(1) the party to be estopped must know

18   the facts; (2) [h]e must intend that his conduct shall be acted upon, or must so act that the party

19   asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the

20   estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his

21   injury.'" *Id.* (quoting *DRG/Beverly Hills*, 30 Cal. App. 4th at 59) (brackets in original); *cf. Wade*

22   *v. Markwell & Co.*, 118 Cal. App. 2d 410, 419-20 (1953) (holding that a plaintiff who pawned her

23   fur coat could reclaim it despite a written agreement requiring recovery within thirty days where

24   the defendant verbally represented that she could do so after the deadline and then sought to

25   enforce the writing).

26          GGW's argument in support of its estoppel defense is the same as that for its waiver

27   defense, *i.e.*, that Enercon's agreement to the Insurance Provision precludes it from relying on the

28   Liability Provision here. Opp'n at 22. As discussed above, however, the two provisions operate

United States District Court
Northern District of California

35

independently of one another and are not incompatible.  Thus, GGW cannot argue that Enercon's assent to the one (the Insurance Provision) was meant to induce GGW to assent to the other (the Liability Provision).  GGW's position, moreover, requires Enercon to have known that Mr. Peacock and GGW were seeking insurance that would "cover *all* potential risks" associated with the Phase II investigation, *see* Opp'n at 12 (emphasis added), and that Enercon induced GGW into agreeing to the Liability and Insurance Provisions with the knowledge that the Pollution Exclusion would render GGW's insurance coverage worthless.  But GGW has not produced any record evidence establishing such intent or knowledge.  The Liability Provision was plainly stated.

GGW has therefore failed to raise a genuine dispute of material fact regarding whether Enercon knew all the facts necessary for GGW's inducement theory.  The Court therefore rejects this affirmative defense as a matter of law.

## V.     **CONCLUSION**

For the reasons given above, the Court **GRANTS** Enercon's motion for partial summary judgment with respect to its limitation of liability defense.  The Court thus concludes that Enercon's potential aggregate liability for the claims that GGW asserts in this matter is limited to $14,939.80, as the parties' agreement provides.

This order disposes of Docket No. 78.


**IT IS SO ORDERED**.


Dated: November 18, 2021

_____
EDWARD M. CHEN
United States District Judge